# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 17, 2024

Lyle W. Cayce
Clerk

————————

No. 23-10034

————————

National Federation of the Blind of Texas, Incorporated, *a Texas nonprofit corporation*; Arms of Hope, *a Texas nonprofit corporation*,

*Plaintiffs—Appellees/Cross-Appellants*,

*versus*

City of Arlington, Texas, *a municipal corporation*,

*Defendant—Appellant/Cross-Appellee*.

———————————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:21-CV-2028

———————————————————————

Before Barksdale, Southwick, and Graves, *Circuit Judges*.

Rhesa Hawkins Barksdale, *Circuit Judge*:

These cross-appeals contest the partial summary judgments granted each side, concerning Appellant's ordinance regulating donation boxes in Arlington, Texas (Arlington). Arlington claims the district court reversibly erred in concluding the ordinance violated the First Amendment by restricting the permissible location of donation boxes to three zoning districts. Cross-Appellants contest the conclusions that the ordinance was neither overbroad nor a prior restraint, and that its setback requirement was

constitutional. That part of the judgment concerning the limitation on donation-box locations to certain zoning districts is VACATED and judgment is RENDERED for Arlington on that part; the balance of the judgment is AFFIRMED.

## I.

The following recitation of facts is, of course, based on the summary-judgment record. It includes, *inter alia*: the ordinances; the parties' motions; the declaration of Arlington's code-compliance services director; the sworn statements and depositions of the Cross-Appellants' presidents; Arlington's visual survey of donation boxes; and its supplement to the visual survey.

Cross-Appellants National Federation of the Blind of Texas, Inc. (NFBT), and Arms of Hope (AOH) (collectively Charities) are nonprofit organizations operating in Texas. As one of several means of fundraising, the Charities partner with third-party companies to place donation boxes bearing the Charities' signage throughout the city.

The donation boxes are unattended, stand-alone receptacles that are typically about five feet wide, four feet long, and six feet tall. Commonly constructed of wood, though sometimes metal, the donation boxes are usually enclosed, with an opening on the front for receiving donated property.

The Charities' third-party partners purchase the donated items at 6.6¢ a pound ($66.00 per thousand pounds) and resell the items at for-profit thrift stores. In addition to generating revenue for the Charities, the donation boxes build awareness for, and communicate an appeal to support, their causes.

Donation boxes were, until several years ago, unregulated in Arlington. By 2015, there were nearly 100 throughout the city, with many in

its center. Arlington's code-enforcement officers often fielded complaints about unmaintained donation boxes. In deliberating on potential regulation, Arlington identified numerous problems associated with the donation boxes, *inter alia*: overflowing donated items; operators' failing to maintain their boxes; scavenging in and around the boxes; accumulation of litter and glass around the boxes; and dumping of large items (*e.g.*, mattresses and couches) nearby. Additionally, Arlington considered the donation boxes unsightly, even when they were well-maintained.

In 2016, Arlington enacted an ordinance creating the "Donation Boxes" chapter of the city code. In 2018, it enacted Ordinance No. 18-044 (the Ordinance), amending the 2016 ordinance. The Ordinance makes it "unlawful for any person to place or maintain, or allow to be placed or maintained, a donation box at any location within the City of Arlington, without a valid permit". Arlington, Tex., Ordinance 18-044 § 3.01(A) (21 Aug. 2018). The Ordinance is applicable to all donation boxes, regardless of the operator's non-profit or for-profit status. *See id.* §§ 2.01, 3.01(A). The Ordinance defines a "donation box" as "any drop-off box, container, trailer or other receptacle that is intended for use as a collection point for accepting donated textiles, clothing, shoes, books, toys, dishes, household items, or other salvageable items of personal property". *Id.* § 2.01.

In addition to the permitting-requirement, the Ordinance regulates donation boxes' building material, color, signage, size, upkeep, and maintenance. *See id.* §§ 3.01–.06. It requires donation-box operators to, *inter alia*: apply for a permit; place on the box the permit decal, the operator's contact information, and a notice that all donations must fit within the box; regularly collect the box's contents to prevent overflow; and keep the property around the box clean of trash and debris. *Id.* §§ 3.02–.03.

The Ordinance's stated purpose is "to protect the public health, safety and welfare of Arlington residents[,] . . . protect the aesthetic well-being of the community[,] and promote the tidy and ordered appearance of developed property". *Id.* § 1.02. Two sections of the Ordinance are especially at issue in this action: a zoning provision limiting the permissible placement of donation boxes to three of the city's 28 zoning districts, *id.* § 3.01(C); and a setback requirement, mandating that donation boxes, if adjacent to a street right-of-way, be placed either behind an existing landscape setback or 40-feet away, *id.* § 3.03(I). Between the Ordinance's enactment and spring 2022, Arlington received nine applications for permits and granted five.

After NFBT filed this action pursuant to 42 U.S.C. § 1983, the court permitted AOH's joinder. The Charities contended the Ordinance was facially unconstitutional because: its zoning provision violated the First Amendment (Count I); its setback requirement violated the First Amendment (Count II); it was overbroad (Count III); and its permit requirements operated as an impermissible prior restraint (Count IV). (The Charities also made as-applied challenges in Counts II (setback requirement) and IV (permitting-requirement). The court concluded those challenges were waived, and the Charities do not dispute that ruling on appeal.) The Charities sought declaratory and injunctive relief.

After discovery, both sides moved for summary judgment. The court granted Arlington's summary-judgment motion for Counts II–IV. For Count I (the zoning provision), however, the court concluded the provision was facially unconstitutional because it was not narrowly tailored; and it enjoined Arlington from enforcing the zoning provision against the Charities.

## II.

Arlington asserts the court properly reviewed the Ordinance under the intermediate-scrutiny standard, but erred in concluding the zoning provision was not narrowly tailored. The Charities counter that the court properly ruled the zoning provision was unconstitutional. In their cross-appeal, they assert the court erred by: not applying strict scrutiny; limiting the zoning-provision injunction to the Charities; concluding the setback requirement was constitutional; and not invalidating the Ordinance as a prior restraint.

Our court "review[s] summary-judgment rulings de novo, applying the same standard as the district court". *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 781 (5th Cir. 2024). "Cross-motions must be considered separately, as each movant bears the burden of establishing that no genuine [dispute] of material fact exists and that it is entitled to judgment as a matter of law." *Id.* (citation omitted); *see also* FED. R. CIV. P. 56(a).

A facial challenge to an ordinance's constitutionality is "a pure question of law". *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006). "Courts generally disfavor facial challenges". *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013). "A law implicating the right to expression may be . . . invalidated on a facial challenge if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* at 387 (citation omitted).

Because we hold for the following reasons that the Ordinance's contested provisions are facially constitutional, we need not address either the Charities' overbreadth claim (Count III), or whether the court erred in limiting its now-vacated injunction to the Charities.

A.

The First Amendment, applicable to municipalities vested with state authority through the Fourteenth Amendment, provides that governments "shall make no law . . . abridging the freedom of speech". U.S. Const. amend. I; *see, e.g.*, *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Charitable solicitations are fully-protected speech; and, because the Ordinance regulates all donation boxes, including those operated by both charitable and non-charitable organizations, at least some of the donation boxes regulated by the Ordinance contain charitable solicitations. *E.g.*, *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632–33 (1980). The Ordinance, therefore, implicates protected expression and triggers First Amendment analysis. *See id.* We first consider the Charities' First Amendment challenges to the zoning provision and setback requirement.

1.

For a First Amendment challenge, the appropriate level of scrutiny depends on whether the Ordinance is content-based or content-neutral. If content-based, the Ordinance is "presumptively unconstitutional" and must survive strict scrutiny. *Reed*, 576 U.S. at 163. If content-neutral, intermediate scrutiny applies. *E.g.*, *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022). In making that determination, our court engages in a two-step inquiry: first, whether the Ordinance is facially content-neutral, *e.g.*, *Reed*, 576 U.S. at 163; if so, second, whether the Ordinance has a content-based purpose or justification, *e.g.*, *id.* at 164.

Whether regulation of donation boxes' placement is content-neutral is a question of first impression for our court. In decisions predating the Supreme Court's content-neutrality discussion in *Reagan*, the Sixth and Ninth Circuits split on the question. *See generally Planet Aid v. City of St. Johns*, 782 F.3d 318, 322, 328–30 (6th Cir. 2015) (concluding ordinance was

content-based); *Recycle for Change v. City of Oakland*, 856 F.3d 666, 668–70 (9th Cir. 2017) (concluding ordinance was content-neutral).

a.

As discussed above, we first consider facial content-neutrality. "A regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *Reagan*, 596 U.S. at 69 (alteration in original) (quoting *Reed*, 576 U.S. at 163). A regulation that "requires an examination of speech only in service of drawing neutral, location-based lines" and "is agnostic as to content" is content-neutral. *Id.* Further, "restrictions on solicitation are not content based and do not inherently present the potential for becoming a means of suppressing a particular point of view, so long as they do not discriminate based on topic, subject matter, or viewpoint". *Id.* at 72 (citation omitted).

The Ordinance prohibits the placement in certain locations of "donation box[es]": receptacles "intended for use as a collection point for accepting donated . . . items of personal property". Ordinance 18-044 §§ 2.01 (defining donation boxes), 3.01(C) (outlining permissible zoning districts), 3.03(I) (outlining setback requirement). On its face, the Ordinance regulates all donation boxes without reference to content. The signage on the donation boxes is of no consequence. *See Reagan*, 596 U.S. at 71–72. Neither does the Ordinance discriminate based on the taxable status, mission, or purpose of the person or entity placing the donation box. It specifically regulates only the manner and place of donation solicitation— *e.g.*, solicitation in the *manner* of a donation box, located in prohibited *places*.

Therefore, the Ordinance "discriminates on the basis of non-expressive, non-communicative conduct"—solicitation manner and place—

but does "not discriminate based on topic, subject matter, or viewpoint". *Recycle for Change*, 856 F.3d at 672; *Reagan*, 596 U.S. at 72.  Moreover, although the Ordinance curtails solicitation by the manner of donation boxes, entities may continue to solicit donations by *all other means* in *all locations* within the city.  The Supreme Court has concluded similar restrictions on only the manner or place of expressive conduct are facially content-neutral. *See, e.g.*, *Reagan*, 596 U.S. at 71–74 (concluding regulation of off-premises signs was location-based and content-neutral); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 643, 648–50, 655 (1981) (concluding ordinance prohibiting distribution of literature except in restricted area during state fair was constitutional time, place, and manner regulation).

In opposition, the Charities assert:  by regulating receptacles that solicit *donations* but no others (*e.g.*, receptacles collecting trash or ballots), the Ordinance targets *charitable* solicitations and is therefore content-based. *Compare Planet Aid*, 782 F.3d at 328 (accepting assertion that ordinance "bans only those [donation boxes] with an expressive message on a particular topic—charitable solicitation and giving"), *with Recycle for Change*, 856 F.3d at 671 n.3 (critiquing *Planet Aid*).  *Donated* items, however, do not have an exclusively *charitable* connotation.  "[D]onate" means "[t]o give (property or money) without receiving consideration for the transfer".  *Donate*, Black's Law Dictionary (11th ed. 2019).  "[D]onation" means "[a] gift, esp[ecially] to a charity; something, esp[ecially] money, that someone gives to a person or an organization by way of help".  *Donation*, Black's Law Dictionary (11th ed. 2019); *see also Donation*, Oxford English Dictionary (2d ed. 1989) ("The action or contract by which a person transfers the ownership of a thing from himself to another, as a free gift.").  Neither party offers a definition of "charity", but it typically relates to those in need.  *See Charity*, Black's Law Dictionary (11th ed. 2019) ("Aid

given to the poor, the suffering, or the general community for religious, educational, economic, public-safety, or medical purposes."); *Charity*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/charity (last visited 5 June 2024) (defining "charity" as, *inter alia*, "generosity and helpfulness especially toward the needy or suffering"); *Charitable*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Dedicated to a general public purpose, usu[ally] for the benefit of needy people who cannot pay for benefits received".).

*National Federation of the Blind of Texas, Inc. v. Abbott* further demonstrates that donation boxes can be operated for non-charitable purposes. 647 F.3d 202 (5th Cir. 2011). In *Abbott*, the act at issue required certain disclosures from for-profit entities operating donation boxes when, *inter alia*, "none of the proceeds from the sale of the donated items will be given to a charitable organization". *Id.* at 206 (quoting TEX. BUS. & COM. CODE § 17.922(b)).

As noted, the Ordinance regulates all donation boxes, encompassing both charitable and non-charitable solicitations. It "is agnostic as to content", and, therefore, facially content-neutral to the extent it regulates expressive activity. *Reagan*, 596 U.S. at 69.

b.

Therefore, as also discussed above, we turn to whether the Ordinance has a content-based purpose or justification. *E.g.*, *Reed*, 576 U.S. at 164. The Charities do not contest the district court's conclusion that the Ordinance does not.

c.

In the alternative, the Charities contend *Abbott* is binding precedent, requiring application of strict scrutiny here. Our court held in *Abbott* that

9

Texas' donation-box law "regulates charitable solicitations and is to be evaluated under *Riley*, *Munson*, and *Schaumburg*". *Abbott*, 647 F.3d at 214; *see generally Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781 (1988); *Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947 (1984); *Schaumburg*, 444 U.S. 620. Under those cases, a regulation will "be sustained as constitutional under the Speech Clause if (1) it 'serves a sufficiently strong, subordinating interest that the [government] is entitled to protect' and (2) it is 'narrowly drawn . . . to serve the interest without unnecessarily interfering with First Amendment freedoms'". *Abbott*, 647 F.3d at 213 (alterations in original) (citation omitted) (quoting *Munson*, 467 U.S. at 961). Although *Riley*, *Munson*, and *Schaumburg* required a stricter scrutiny in *Abbott*, their holding is inapplicable here.

First, the act in *Abbott* is distinguishable from the Ordinance. The former required, *inter alia*, for-profit entities to disclose aspects of their profit structure on the public donation boxes they operated. *Id.* at 206. Here, rather than forced disclosures, the Charities challenge the Ordinance's location restrictions and the asserted vagueness of its permit requirements.

Second, the rule announced in *Abbott* applies only to "disclosures". *See Abbott*, 647 F.3d at 212–13 ("We must first determine whether the public receptacle *disclosures* at issue are merely commercial speech, . . . or whether the *disclosures* are 'charitable solicitations' . . . . Having determined that the public receptacle *disclosures* at issue are charitable solicitations, we evaluate the constitutionality of [the act] under [strict scrutiny]." (emphasis added)). No "disclosures" are at issue here.

Third, the act in *Abbott* was, in fact, content-based. *See, e.g.*, *Riley*, 487 U.S. at 795 ("Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech."); *see also Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) (quoting *Riley*). As noted,

content-based regulations on speech are subject to strict scrutiny. *Reed*, 576 U.S. at 163.

2.

Accordingly, because the Ordinance is content-neutral, we, as also noted, analyze it under intermediate scrutiny. Content-neutral regulations are permitted when they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication". *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983); *see also Moore v. Brown*, 868 F.3d 398, 403–04 (5th Cir. 2017) (outlining same standard).

Arlington asserts the significant government interests of: protecting the public's health, safety, and welfare; safeguarding the community aesthetic; promoting the ordered appearance of developed property; and increasing the accountability of donation-box operators. *See* Ordinance 18-044 § 1.02. The Charities do not dispute these interests, and the Supreme Court has concluded they are significant. *See Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 805–07 (1984) ("[M]unicipalities have a weighty, essentially [a]esthetic interest in proscribing intrusive and unpleasant formats for expression".); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 510 (1981) (plurality opinion) (upholding city's aesthetic interest in removing billboards in part because "[s]uch [a]esthetic judgments are necessarily subjective, defying objective evaluation"); *McCullen v. Coakley*, 573 U.S. 464, 486–87 (2014) (recognizing legitimacy of government's interests in "ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights" (citation omitted)).

As a result, the only remaining question is whether the zoning provision and setback requirement are (1) "narrowly tailored" and (2) "leave open ample alternative channels of communication". *Perry*, 460 U.S. at 45.

a.

Arlington must show the zoning provision is narrowly tailored to serve its significant government interests. *See, e.g.*, *Moore*, 868 F.3d at 403–04 (outlining rule). The zoning provision dictates, *inter alia*: "Donation boxes shall only be permitted to be placed on real property located within the following zoning use districts in the Unified Development Code: Industrial Manufacturing (IM), Light Industrial (LI), and General Commercial (GC)". Ordinance 18-044 § 3.01(C).

For Arlington's 28 zoning districts, seven are "overlay" districts, which only include acreage already accounted for by other districts, and four currently contain no acreage. For the remaining 17 districts, nine are residential; eight, non-residential. Arlington contends that allowing donation boxes in three of its eight non-residential zoning districts is narrowly tailored to its interests. These three districts constitute 62 percent of all non-residentially-zoned land in Arlington, comprising over 7,138 acres. The Charities respond that they seek to place donation boxes in residentially-zoned districts, particularly at churches, and the three districts where boxes are permitted are on the periphery of the city, unlikely to be seen by potential donors.

"[N]arrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation". *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989) (second alteration in original) (citation omitted). The Ordinance "need not be the least restrictive or least intrusive means of" promoting the governmental interest, but it may not "burden substantially more speech

than is necessary to further the government's legitimate interests". *Id.* at 798–99. "Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* at 799. Most recently, the Supreme Court explained: "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier". *McCullen*, 573 U.S. at 495.

The Charities contend the zoning provision burdens substantially more speech than necessary to achieve Arlington's significant interests. *See Ward*, 491 U.S. at 798–800 (outlining narrow-tailoring rule). Arlington counters that even well-maintained donation boxes are unsightly. Meaning, to achieve its significant government interest of safeguarding the community aesthetic, it must regulate the boxes themselves.

Arlington's contention invokes *Taxpayers for Vincent* where, because "the substantive evil—visual blight—[wa]s not merely a possible by-product of the activity, but [wa]s created by the medium of expression itself", the at-issue ordinance (which banned posting signs on public property) "curtail[ed] no more speech than [wa]s necessary to accomplish its purpose". 466 U.S. at 810. The Court upheld the constitutionality of a total prohibition. *Id.* at 817. In contrast, the zoning provision continues to allow donation boxes in three zoning districts.

The partial dissent at 3 would require record evidence showing "the existence of boxes anywhere, in any condition, was the problem the city set out to address" before applying *Taxpayers for Vincent*. As explained *supra*, Arlington's asserted interests in safeguarding the community aesthetic and promoting the ordered appearance of developed property are undisputed. Additionally, the record does include evidence (as demonstrated, *inter alia*,

by the partial dissent's at 1 quoting Arlington's code-compliance services director) that the donation boxes themselves constitute aesthetic harm. *See also id.* at 808 ("The plurality wrote in *Metromedia*: 'It is not speculative to recognize that billboards by their very nature, wherever located and however constructed, can be perceived as an esthetic harm.' The same is true of posted signs." (citation omitted)); *Metromedia*, 453 U.S. at 510 (explaining, in discussing billboard ordinance, that "San Diego, like many States and other municipalities, has chosen to minimize the presence of such structures. Such esthetic judgments are necessarily subjective, defying objective evaluation" (footnote omitted)).

The Charities contend the Court narrowed the applicability of *Taxpayers for Vincent* to mediums of speech that are "not a uniquely valuable or important mode of communication" and where there is "no evidence that [speakers'] ability to communicate effectively is threatened by ever-increasing restrictions on expression". *City of Ladue v. Gilleo*, 512 U.S. 43, 54 (1994) (citation omitted). They assert donation boxes are a uniquely valuable and important mode of communication.

In *Gilleo*, the ordinance prohibited "homeowners from displaying any signs on their property except 'residence identification' signs, 'for sale' signs, and signs warning of safety hazards". *Id.* at 45. Particularly relevant to the Court's decision was that, unlike here, the ordinance foreclosed an entire medium of expression and left no ample alternative channels of communication. *Id.* at 55–57 ("Residential signs are an unusually cheap and convenient form of communication. Especially for persons of modest means or limited mobility, a yard or window sign may have no practical substitute."). And, unlike *Gilleo*'s residential signs, donation boxes "have [not] long been an important and distinct medium of expression". *Id.* at 55.

Because one of the substantive evils Arlington seeks to eliminate—"visual blight"—is created in part by the donation boxes themselves, the zoning provision "curtails no more speech than is necessary to accomplish its purpose". *Taxpayers for Vincent*, 466 U.S. at 810; *see also Frisby v. Schultz*, 487 U.S. 474, 476, 485–88 (1988) (upholding ordinance banning picketing "before or about" any residence because "[a] statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy"); *H & A Land Corp. v. City of Kennedale*, 480 F.3d 336, 338 (5th Cir. 2007) (quoting *Frisby* rule). The provision is narrowly tailored. (The partial dissent at 2 contends Arlington's interest in preventing the "clustering and proliferation" of donation boxes is adequately addressed by the Ordinance's permitting-requirement and provision limiting donations boxes to one per lot. *See* Ordinance 18-044 § 3.03(D). But allowing only one donation box per lot does little to address Arlington's proliferation concern.)

The provision also "leave[s] open ample alternative channels of communication". *Moore*, 868 F.3d at 404. As discussed *supra*, the scope of the Ordinance is limited. First, the Charities may continue to place donation boxes in accordance with the Ordinance. Also, the Charities are not prohibited under the Ordinance from using *any* other method in *every* zoning district to solicit donations. Along that line, the Charities solicit donations through other channels, including: at-home pickup services, church pickup services, magazine flyers, and store-front drop-off locations. Ample alternative channels of communication exist under the Ordinance. *See, e.g.*, *Taxpayers for Vincent*, 466 U.S. at 812 (concluding ample alternative channels existed when ordinance did not prohibit individuals from speaking or distributing literature in location where posting signs was prohibited).

b.

Arlington must likewise show the setback requirement is narrowly tailored to serve its significant government interests and leaves ample alternative channels of communication. *See, e.g.*, *Moore*, 868 F.3d at 403–04. The setback requirement provides: "No donation box shall be permitted within the row of parking adjacent to street right-of-way unless an existing landscape setback is present in good condition. If there is no existing landscape setback, a donation box shall not be placed less than 40 feet from the adjacent street right-of-way." Ordinance 18-044 § 3.03(I).

In seeking to avoid summary judgment on the setback issue, the Charities contend Arlington has not shown there is no genuine dispute of material fact for whether a 40-foot setback is more necessary than a smaller one. *See Ward*, 491 U.S. at 799 (explaining narrowly tailored provision may not "burden substantially more speech than is necessary"). They also maintain the district court erred in disregarding as "unsupported" the Charities' deposition testimony about the public's difficulty seeing donation boxes behind the requisite setback.

The analysis for the setback requirement is much the same as for the zoning provision. Arlington notes the setback requirement serves its significant government interests of: traffic safety; aesthetic appearance; and the safety and welfare of pedestrians, property owners, and others. Arlington presented evidence showing donation boxes were sometimes surrounded by glass and debris that posed a danger to vehicles or pedestrians.

The narrow-tailoring standard is outlined *supra*. *See, e.g.*, *Ward*, 491 U.S. at 798–800. First, because Arlington asserts even well-maintained boxes are unsightly, the setback requirement, like the zoning provision, "curtails no more speech than is necessary to accomplish its purpose". *Taxpayers for Vincent*, 466 U.S. at 810; *see also Frisby*, 487 U.S. at 485–88;

*Metromedia*, 453 U.S. at 510. Second, we hold that requiring a 40-foot setback when there is no existing landscape setback does not "burden substantially more speech than is necessary". *Ward*, 491 U.S. at 799. Finally, all of the alternative channels of communication, discussed *supra*, remain available.

The Charities contend the deposition testimony of their presidents established a genuine dispute of material fact for whether the setback requirement is narrowly tailored. The presidents explained that the requirement made it nearly impossible to find a compliant location for a bin. As noted, the district court concluded the testimony was "unsupported" and did not create a genuine issue of material fact. The Charities assert summary-judgment evidence "must be taken as true" and "viewed in the light most favorable to the party opposing the motion". *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (citations omitted).

NFBT's president testified in her deposition, *inter alia*, that the setback requirement "make[s] it very difficult to find a location that's visible . . . that would get our message out there". She stated her testimony was "based on the ordinance itself or [her] understanding of—of the requirements in the ordinance . . . . Just the placement requirements". Similarly, AOH's president testified in his deposition that "it's extremely difficult, if not impossible, to place a bin when you're looking at 40 feet". This testimony was based on information conveyed to him by AOH's professional fundraiser who had "found that 40 feet is way too far".

Because facial challenges are pure questions of law, and in the light of the analysis *supra*, the setback requirement is narrowly tailored, even assuming *arguendo* that the deposition testimony is competent summary-judgment evidence. *See Taxpayers for Vincent*, 466 U.S. at 810; *Frisby*, 487 U.S. at 485; *Carmouche*, 449 F.3d at 662. The presidents' deposition testimony, however, is not competent summary-judgment evidence. Neither

comports with Federal Rule of Civil Procedure 56 (requiring statements to "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated"). Our court has concluded testimony is insufficient to create a genuine dispute of material fact when it is "conclusory, vague, or not based on personal knowledge". *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 161 (5th Cir. 2021). Neither president makes their statement on personal knowledge and both statements are conclusory.

## B.

The Charities last contend the Ordinance's permitting-provisions constitute an unconstitutional prior restraint because several of the key terms are vague and undefined, and the provisions lack guidance on how to measure setback distances. The allegedly vague terms include "in good condition", "right-of-way", "residential dwelling use district", and "City Appeal Officer". Ordinance 18-044 §§ 3.03(I), 3.06(J), 3.09(D), 3.10.

"[T]he [Supreme] Court has long held that 'law[s] subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, [are] unconstitutional'". *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 427 (5th Cir. 2020) (third and fourth alterations in original) (quoting *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969)). This is often referred to as the "unbridled discretion doctrine". *Id.* "A government regulation that allows arbitrary application is inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (citation omitted). "[A] time, place, and manner regulation [must] contain adequate standards to guide the official's decision and render it

subject to effective judicial review". *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 323 (2002).

The Ordinance meets that test. *Cf. Shuttlesworth*, 394 U.S. at 149–51 (ruling ordinance was prior restraint because commission could refuse parade permits when "public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused"); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 769–70, 772 (1988) (ruling ordinance was prior restraint because it authorized mayor to refuse permit for newspaper stand for reasons "deemed necessary and reasonable by the Mayor"); *Forsyth County*, 505 U.S. at 126–27, 132–33 (ruling ordinance was prior restraint because it allowed administrator to adjust mandated fee for parades without "articulated standards", "objective factors", or "explanation"). To obtain a permit under the Ordinance, an applicant need only satisfy the objective criteria provided in the Ordinance. Then, the permit "*shall* be issued by the Administrator within sixty (60) days of receipt of a completed application after determining that all the requirements of this Section are satisfied". Ordinance 18-044 § 3.03(A) (emphasis added). The Ordinance requires Arlington to notify the applicant in writing of the reason for denial or revocation and it provides an appeal process for such actions. *Id.* § 3.09.

Even if we assume vagueness in the words identified by the Charities, the Ordinance's standards "are *reasonably* specific and objective, and do not leave the decision to the whim of the administrator". *Thomas*, 534 U.S. at 324 (emphasis added) (citation omitted).

## III.

For the foregoing reasons, that part of the judgment concerning the zoning provision is VACATED and judgment is RENDERED for Arlington on that part. In all other respects, and in accordance with the foregoing, the judgment is AFFIRMED.

No. 23-10034

James E. Graves, Jr., *Circuit Judge*, concurring in part and dissenting in part:

I agree in large part with the majority's careful opinion. But I would affirm the district court's conclusion that the zoning provision fails to pass intermediate scrutiny. That provision is not narrowly tailored, particularly in light of other ordinance provisions that directly address Arlington's documented concerns. I respectfully dissent from that portion of the opinion.

To justify the zoning provision, the city was required to "demonstrate that alternative measures that burden substantially less speech . . . fail to achieve [its] interests." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014). The "alternative measures" at issue are other provisions of Arlington's ordinance regulating donation boxes. The record shows that those other provisions are narrowly tailored to achieve all of the city's interests. And they are substantially less speech-restrictive than the zoning provision.

The record illustrates the concerns that motivated the ordinance. The ordinance itself declares that it is "intended to provide efficient legal remedies for unpermitted or poorly maintained donation boxes." The city's code compliance director testified about out-of-control proliferation of boxes—especially the "prolific number" in the city's high-traffic Community Commercial zones. He said, "[e]ven when donation boxes are well-maintained, they can be unsightly, *particularly in large numbers*." (Emphasis added.)

There is also Arlington's 2018 box study. The study noted "[l]arge abandoned items and litter" around some boxes, an occurrence more frequent when multiple boxes were situated on one lot. The litter was worst when "[boxes] were not on a single property with a single, operating business"; when they were "placed in a back parking lot or a parking area not connected to a specific business"; and when they lacked contact information.

1

No. 23-10034

The study noted that "litter surrounding donation bins was often not removed even when a bin is otherwise maintained." Still, some boxes had no problems, including boxes collecting donations for Arms of Hope.

Those motivating concerns are specific—namely, the construction, labeling, maintenance, placement, clustering, and unchecked accumulation of boxes. The non-zoning provisions of the ordinance precisely targets them. It addresses construction problems by requiring boxes to be made of metal, limited to 120 cubic feet, and painted a single, non-fluorescent color. It addresses labeling and accountability by requiring contact information to be displayed. It addresses maintenance through cleaning requirements and by imposing joint and several liability on permit holders and property owners for failure to meet those requirements. It addresses placement through a setback requirement and by prohibiting boxes in easements and driveways. And it addresses clustering and proliferation through the permitting requirement and by generally restricting boxes to no more than one per lot.

The city then layered the zoning provision over the top of those targeted provisions. And the zoning provision's effect is much more drastic. It outright bans the boxes not just from the Community Commercial zones that are the focus of the city's concerns, but also from the 577 city acres that are zoned Office Commercial and from *all* residential zones, where at least some churches are located. Those are areas where, if the boxes were properly maintained, their presence would seem to be both appropriate and particularly useful to the Charities.

A "regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). But the district court did not just invent "some less-speech-restrictive alternative" and speculate that it "*could* . . . adequately serve[]"

2

the city's interests. *Id.* It examined ordinance provisions that the *city itself* had adopted and found them to be both narrowly tailored to the city's concerns and substantially less speech restrictive than the zoning provision.

The majority's analysis of the zoning provision relies on *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984). There, the Supreme Court concluded that the "visual assault . . . presented by [the] accumulation of signs" on public property was "a significant substantive evil within the [c]ity's power to prohibit." *Vincent*, 466 U.S. at 807. The city's prohibition on such signs was a proper means to address that "evil." *Id.* at 808. In the majority's view here, the zoning provision is similarly justified because the city's concern about visual blight "is created in part by the donation boxes themselves." *Ante* at 15.

If the record showed that the existence of boxes anywhere, in any condition, was the problem the city set out to address, even a total ban might be allowed under *Vincent*. But it does not. It shows that boxes created *specific* problems; that the city created specific provisions to address those specific problems; and that it *also* created a zoning provision attacking the boxes much more indiscriminately.

In *Vincent*, the Court differentiated between narrowly tailored rules that "respond[] precisely" to a city's problems and broad rules that end up "gratuitously infring[ing] upon" protected speech. *Id.* at 810. The zoning provision is an example of the latter. Its substantial speech limitations are not necessary to serve the city's goals, particularly in light of other ordinance provisions that more properly "focus[] on the source of the evils the city seeks to eliminate." *See Ward*, 491 U.S. at 799 & n.7.

I would affirm the district court's conclusion that the zoning provision violates the First Amendment. Accordingly, I respectfully dissent from that part of the majority's opinion.

3