**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-12662
_____

DENNIS SCOTT,
CHAD DRIGGERS,
DOUGLAS WILLIS,
GEORGE ROWLAND,

*Plaintiffs-Appellees,*

*versus*

CITY OF DAYTONA BEACH, FLORIDA,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:22-cv-02192-WWB-RMN
_____

———————————————

No. 24-12964

———————————————

DENNIS SCOTT,
CHAD DRIGGERS,
DOUGLAS WILLIS,
GEORGE ROWLAND,

*Plaintiffs-Appellees,*

*versus*

CITY OF DAYTONA BEACH, FLORIDA,

*Defendant-Appellant.*

———————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:22-cv-02192-WWB-RMN

———————————————

Before NEWSOM, BRASHER, and TJOFLAT, Circuit Judges.

NEWSOM, Circuit Judge:

Panhandling is divisive. For some, it's a way of life—perhaps even a matter of life and death. To others, though, panhandling is a nuisance—they say it compromises safety and sanitation, unsettles residents, and generally degrades the social order. Having concluded that panhandling's costs outweigh its benefits, Daytona Beach adopted an ordinance broadly restricting it within city limits.

Four men who regularly panhandle in Daytona Beach challenged most of the ordinance's provisions, claiming that they

violate the First Amendment.  Agreeing, the district court granted the plaintiffs summary judgment, enjoined enforcement of the challenged provisions, and awarded damages.

For the most part, we too agree—the ordinance imposes content-based restrictions on the plaintiffs' speech, and those restrictions fail strict scrutiny.  We part ways with the district court, though, on two jurisdictional issues.  On the front end of the case, so to speak, we hold that the plaintiffs have failed to establish standing to attack some of the ordinance's provisions.  And on the back end, we hold that the district court overstepped its authority when it issued what was, in effect, a universal injunction.  Accordingly, we affirm in part and vacate in part the district court's order.[1]

## I

## A

In 2019, Daytona Beach confronted a problem.  Local police had received numerous complaints about panhandling, and city leaders feared that panhandlers' conduct was undermining safety, aesthetics, and residents' and visitors' general experience. The city was particularly alarmed by the rise of what it called "aggressive panhandling"—beggars using profanity or touching or intimidating others as a means of inducing donations.  In an effort to address the

---

[1] We also affirm the district court's damages award, as the parties stipulated that the plaintiffs are entitled to the full amount if we deem any provision of the ordinance unconstitutional.

issues it perceived, Daytona Beach enacted Ordinance No. 19-27, which substantially restricted panhandling in the city.

The specifics of the ordinance are key to evaluating its constitutionality, so we'll take some time to describe them here. We'll begin with four key definitions and then move on to the ordinance's operative provisions. First, and most importantly, the ordinance provides a detailed (if a little clunky) definition of "panhandle":

> *Panhandle* means to beg or make any demand or request made in person for an immediate donation of money or some other article of value from another person for the use of one's self or others, including but not limited to for a charitable or sponsor purpose or that will benefit a charitable organization or sponsor. As used in this article, the word "solicit" and its forms are included in this definition. Panhandling is considered as having taken place regardless of whether the person making the solicitation received any contribution. Any purchase of an item for an amount far exceeding its value, under circumstances where a reasonable person would understand that the purchase is in substance a donation, constitutes a donation as contemplated in this definition. Begging is included in this definition of Panhandling. Soliciting is includ[ed] in this definition of Panhandling.

Daytona Beach, Fla., Code § 66-1(b)(3) (MuniCode Supp. 2019).

Second and third, we need to define the words "beg" and "solicit," to which the ordinance's definition of "panhandle"

repeatedly refers.  Because the ordinance itself doesn't define those constituent terms, we ask how an ordinary person would understand them—that is, "how a reasonable person, conversant with the relevant social and linguistic conventions, would read the[m] in context." *United States v. Pate*, 84 F.4th 1196, 1201 (11th Cir. 2023) (en banc) (quoting John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2392–93 (2003)).  While not dispositive, dictionary definitions can be indicative of words' ordinary understanding.  One prominent descriptive dictionary defines the term "beg" as "to ask for as a charity esp[ecially] habitually or from house to house," and "to ask for alms or charity."  *Beg*, Webster's Third New International Dictionary (1961); *accord, e.g.*, *Beg*, Black's Law Dictionary (11th ed. 2019) ("[t]o ask for charity, esp[ecially] habitually or pitiably").  The same volume defines the word "solicit" as "to approach with a request or plea (as in selling or begging)," and "to endeavor to obtain by asking or pleading."  *Solicit*, Webster's Third New International Dictionary, *supra*; *accord, e.g.*, *Solicitation*, Black's Law Dictionary, *supra* ("the act or an instance of requesting or seeking to obtain something," or "an attempt or effort to gain business"); *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 72 (2022) (adopting the *Black's* definition of "solicitation").

For our purposes, "beg" is easy.  The ordinary understanding of that term fits comfortably within the ordinance's definition of "panhandle."  "Solicit" is trickier.  According to the dictionary, at least, it covers *any* request to obtain *anything*—not just money or an article of value.  Importantly, though, the ordinance expressly limits panhandling to requests for "donation[s]."  Daytona Beach,

6                    Opinion of the Court                    24-12662

Fla., Code § 66-1(b)(3); *see also* Br. of Appellant at 26 (acknowledging that the ordinance doesn't apply to commercial solicitations). Because the ordinance expressly characterizes "[s]olicit[ation]" as a subset of donation-focused "panhandl[ing]," it would be nonsensical—at least for present purposes—for "solicit" to carry its broader meaning.[2] So we're left to infer from context the sense of the term "solicit" as it is used in the ordinance. At times the ordinance appears to use "panhandle" and "solicit" interchangeably—the definition section, for example, provides that "[p]anhandling is considered as having taken place regardless of whether the person making the solicitation received any contribution." Daytona Beach, Fla., Code § 66-1(b)(3). The ordinance makes clear, though, that "[s]oliciting is *included* in th[e] definition of panhandling." *Id*. (emphasis added). The term "solicit" is thus best read to refer to pretty much everything covered by the term "panhandle," but no more.

Finally, "aggressive panhandling." The ordinance explains that term by reference to five particular means of seeking donations. (Warning: This is tedious, but while we're defining terms, we think it better to quote than to paraphrase.) To "aggressive[ly] panhandl[e]," the ordinance says, is (1) "[t]o approach or speak to a person and demand, request or beg for money or a donation of

---

[2] It's true that in ordinary parlance, panhandling might be a subset of solicitation—after all, making a "demand or request . . . in person for an immediate donation of money or some other article of value," *id*., is one means of "requesting or seeking to obtain something," *Solicitation*, Black's Law Dictionary, *supra*. But under the ordinance—whose definitions we must respect—the reverse is true.

valuable property in such a manner as would cause a reasonable person to believe that the person is being threatened with imminent bodily injury or the commission of a criminal act upon the person approached or another person in the solicited person's company, or upon property in the person's immediate possession"; (2) "[t]o maintain contact with a solicited person and continue demanding, requesting or begging for money or a donation of valuable property after the solicited person has made a negative response to an initial demand or request"; (3) "[t]o obstruct, block or impede . . . the passage or free movement of a solicited person or a person in the company of a solicited person"; (4) "[t]o touch or cause physical contact to a solicited person or a person in the company of a solicited person, or to touch any vehicle occupied by a solicited person or by a person in the company of the solicited person, without the person's express consent"; or (5) "[t]o engage in conduct that would reasonably be construed as intended to intimidate, compel or force a solicited person to accede to demands." *Id.* § 66-1(b)(2)(a)–(e).

The definitional work done, we proceed to the ordinance's operative provisions. The substantive restrictions can be divided into three categories. First, and most straightforwardly, the ordinance bans aggressive panhandling citywide, including in all "public or semi-public area[s]." *Id.* § 66-1(c)(1).

Second, the ordinance prohibits garden-variety panhandling in locations throughout the city. Among them: at or near "commercially zoned property," *id.* § 66-1(c)(3)(a), "bus [and] trolley

stop[s]" and other "public transportation facilit[ies]," *id.* § 66-1(c)(3)(b), ATMs, *id.* § 66-1(c)(3)(c), "parking lot[s]" and other parking facilities, *id.* § 66-1(c)(3)(d), "public restroom[s]," *id.* § 66-1(c)(3)(e), "daycare[s] [and] school[s]," *id.* § 66-1(c)(3)(f), and certain "signalized intersection[s]," *id.* § 66-1(c)(3)(g), as well as on the Daytona Beach Boardwalk, a beachfront promenade, *id.* § 66-1(c)(3)(h).

Third, the ordinance restricts certain methods of panhandling, many of which overlap with the practices covered by the prohibition on aggressive panhandling and the location-based provisions. So, for instance, the ordinance prohibits approaching anyone in a car "in an aggressive manner," *id.* § 66-1(c)(4)(a), panhandling at "outdoor dining area[s,] . . . seating area[s], playground[s,] [and] . . . merchandise area[s], *id.* § 66-1(c)(4)(b), panhandling at "transit stop[s]," *id.* § 66-1(c)(4)(c), and panhandling from people "in line waiting to be admitted to a commercial establishment," *id.* § 66-1(c)(4)(d). The ordinance also prohibits "touching [a solicited person] without that person's consent," *id.* § 66-1(c)(4)(e), using "profane or abusive" language during a panhandling interaction, *id.* § 66-1(c)(4)(f), and employing threatening "gesture[s] or act[s]" to induce donations, *id.* § 66-1(c)(4)(g), as well as panhandling "under the influence of alcohol" or illegal drugs, *id.* § 66-1(c)(4)(h), and panhandling "[a]fter [d]ark," *id.* § 66-1(c)(4)(i).

## B

Shortly after the ordinance's enactment, the city set about enforcing it, including against the four plaintiffs here. Dennis Scott,

Douglas Willis, Chad Driggers, and George Rowland all panhandle in Daytona Beach.  Each is, or has been, homeless, and all subsist on the money and goods that they obtain panhandling.  The men panhandle throughout the city:  Scott panhandles around the Daytona International Speedway and asks for donations as cars leave the area's shopping centers.  He has also panhandled at the I-95 offramp to the west of the racetrack.  Willis spends most of his time near the Boardwalk, and he requests donations from passersby on or around public sidewalks near the beach.  He has panhandled both on sidewalks and along public roadways in the area.  Driggers and Rowland seem to cover the same basic territories; they spend most of their time near Ridgewood and Mason Avenues, which intersect in northern Daytona Beach.

Daytona Beach police have threatened to arrest each of the plaintiffs—and, in the case of Driggers, actually arrested him—for violating the ordinance.  Perhaps not surprisingly, each of the plaintiffs has limited his panhandling because of the crackdown.

## C

In 2022, Scott, Driggers, Willis, and Rowland sued Daytona Beach in federal court under 42 U.S.C. § 1983, alleging that 18 of the ordinance's 19 restrictions violate their First Amendment free-

speech rights, and seeking declaratory and injunctive relief as well as damages.[3]  They brought both facial and as-applied challenges.

Following discovery, the plaintiffs moved for partial summary judgment, which the district court granted.  The court issued a declaratory judgment holding that the challenged provisions violate the First Amendment.  It first concluded that the challenged provisions were content-based speech restrictions because they applied only to a subset of solicitation—namely, requests "for charitable donations."  The court next held that each of the provisions failed strict scrutiny because it was either under- or over-inclusive.  After holding the challenged provisions unconstitutional, the court permanently enjoined their enforcement and scheduled a bench trial on the issue of damages.  Daytona Beach appealed.

Seeking to avoid trial, the parties entered into a stipulation regarding damages and jointly moved for judgment.  Pursuant to the stipulation, the plaintiffs are entitled to $80,000 if, but only if, this Court declares any provision of the ordinance unconstitutional.  Consistent with the parties' joint motion, the district court entered final judgment in favor of the plaintiffs.  The city appealed.  The  damages appeal was consolidated with the summary judgment appeal.

★        ★        ★

---

[3] The one provision the plaintiffs didn't challenge is § 66-1(c)(2), which prohibits aggressive panhandling on the private property of someone who has prohibited panhandling or posted a sign to that effect.

Our opinion proceeds in three parts.  First, we address (as we must) the plaintiffs' standing to challenge each of the ordinance's provisions.  We hold that one or more of the plaintiffs has standing to attack some, but not all, of those provisions.  Second, we take up the merits.  We hold that seven of the ordinance's provisions—those that at least one plaintiff has standing to challenge—violate the First Amendment.  We decline to evaluate the merits of the plaintiffs' challenge to the other 11 provisions.  And finally, we consider the propriety of the district court's remedies.  We hold that the court's declaratory judgment and injunction were overbroad.

## II

First up, standing.[4]  Because standing "is a threshold jurisdictional question," we must assure ourselves "not only of [our] own jurisdiction, but also of that of the [district] court[]."  *AT&T Mobility, LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 494 F.3d 1356, 1359–60 (11th Cir. 2007).  That's true regardless of whether, or how thoroughly, the parties have briefed the standing issue.  *Id.* at 1360.

To establish standing, a plaintiff must show three things: (1) that he has suffered an "injury in fact," (2) that his injury was caused by the defendant's conduct, and (3) that a favorable decision would likely redress his injury.  *Henry v. Att'y Gen.*, 45 F.4th 1272, 1287

---

[4] We review de novo whether a plaintiff has standing.  *Henry v. Att'y Gen.*, 45 F.4th 1272, 1280 (11th Cir. 2022).  We also review de novo an order granting summary judgment.  *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1239 (11th Cir. 2018).

(11th Cir. 2022).  Here, the latter two requirements—causation and redressability—are clearly satisfied.  As the district court observed, the city's police officers made the arrests and threats that allegedly chilled the plaintiffs' speech.  And a declaration that the challenged provisions are unconstitutional, as well as an injunction against their enforcement, would permit the plaintiffs to panhandle without fear of arrest and prosecution.  So too, damages would compensate the plaintiffs for their past injuries.

Accordingly, the plaintiffs' standing depends on the first element: injury in fact.  And the analysis of that element turns out to be significantly more complicated than the district court and the parties seem to have recognized.  Bottom line:  We hold that *some* of the plaintiffs have adequately demonstrated such an injury resulting from *certain* provisions of the ordinance.  But not all the plaintiffs have shown an injury in fact stemming from each of the challenged provisions.

Our evaluation of the standing issues in the case proceeds in four parts.  First, we'll explain the injury-in-fact requirement's application in free-speech cases.  Second, we'll describe the interaction between standing doctrine and the traditional summary judgment standard.  Third, we'll unpack the requirement that each plaintiff have standing to challenge each of the ordinance's provisions.  And finally, we'll apply all that law to the plaintiffs' challenges here.

### A

To constitute a cognizable Article III injury, "an invasion of a legally protected interest" must be both "(a) concrete and particularized[] and (b) actual or imminent." *Henry*, 45 F.4th at 1287. In free-speech cases, sub-element (a) is easy—free-speech violations are "concrete and particularized." *Id.* at 1288; *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)) (holding that "abridgment of free speech" is a "concrete" injury). Sub-element (b) is where the action is.

Whether a plaintiff's injury is "actual or imminent" typically turns on the form of relief he requests. *See Mack v. USAA Cas. Ins. Co.*, 994 F.3d 1353, 1356 (11th Cir. 2021). To seek retrospective relief—*i.e.*, damages—the plaintiff must show a *completed* injury. *See id.* To seek prospective relief—*i.e.*, an injunction or a declaratory judgment—the plaintiff must demonstrate a likelihood of *future* harm. *Id.* at 1357. In the free-speech context, a plaintiff can do so by showing that "the operation or enforcement of the government policy would cause a reasonable would-be speaker to self-censor"—or, in other words, would "'objectively chill[]' protected expression." *Henry*, 45 F.4th at 1288.

Helpfully, when a plaintiff alleges an ongoing chill to his speech, the past- and future-injury inquiries largely converge. Because "an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences," *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001) (quoting *Wilson v. State Bar of Ga.*, 132

F.3d 1422, 1428 (11th Cir. 1998)), an ongoing chill constitutes both imminent harm for prospective-relief purposes, *see Henry*, 45 F.4th at 1288, and actual, completed injury for retrospective-relief purposes, *see Uzuegbunam v. Preczewski*, 592 U.S. 279, 293 (2021) (holding that a plaintiff can seek nominal damages for a violation of his free-speech rights); *Finch v. City of Vernon*, 877 F.2d 1497, 1503 (11th Cir. 1989) (observing that a plaintiff who has suffered compensable injury as a result of a free-speech violation can sue for money damages). Accordingly, in this case, if a plaintiff can show that a provision of Daytona Beach's ordinance objectively chills his protected expression, he has demonstrated standing to seek both prospective and retrospective relief.

**B**

Next up, the interaction between standing and summary judgment. Each standing requirement "must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Henry*, 45 F.4th at 1287 (citation modified). Because this is an appeal from an order granting the plaintiffs summary judgment, the familiar summary judgment standard governs the plaintiffs' evidentiary burden.

Summary judgment is appropriate when there is no genuine dispute about a material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving parties—here, the plaintiffs—bear the initial burden to show the lack of a genuine dispute. *Dawkins v. Fulton Cnty.*, 733 F.3d 1084, 1088 (11th Cir. 2013). "[O]nce that burden is met the burden shifts to

the nonmoving party"—here, Daytona Beach—"to bring the court's attention to evidence demonstrating a genuine issue for trial." *Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1121 (11th Cir. 2014). To do so, the city must present "more than speculation or a mere scintilla of evidence." *Id.* at 1122.

## C

We next address the rule that a plaintiff must establish standing to attack each ordinance provision that he challenges. "[S]tanding is not dispensed in gross." *TransUnion*, 594 U.S. at 431. Rather, "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *Id.* Accordingly, our precedent requires a plaintiff challenging multiple provisions of a law to demonstrate standing as to each one. *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006); *see also Harrell v. Fla. Bar*, 608 F.3d 1241, 1253–54 (11th Cir. 2010). To do so, we held in *CAMP*, a plaintiff must show "that every challenged provision affects [him]" personally. 451 F.3d at 1274 (citation modified).

Here, the district court never conducted the necessary provision-by-provision analysis of the plaintiffs' standing. Instead, based on the way the plaintiffs had framed their complaint, the court grouped the 18 challenged provisions into four categories, which it labeled the "Location-Based Provisions," the "After-Dark Provisions," the "Traffic Provisions," and the "Conduct-Related Provisions." The court then evaluated whether each category of provisions, considered as a whole, chilled the plaintiffs' speech and

16                    Opinion of the Court                    24-12662

concluded that a plaintiff who had been injured by *any* provision in a particular category had standing to challenge *every* provision in that category. But in *CAMP*, we rejected that sort of approach when we held that the plaintiff there didn't have standing to challenge an entire ordinance simply because it had been injured by one of its provisions. Instead—to repeat—we held that a plaintiff has to establish "that every challenged provision affects [him]" personally. 451 F.3d at 1274 (citation modified).

In the next section, we'll conduct a *CAMP*-compliant standing analysis, evaluating the plaintiffs' standing on a provision-by-provision basis. Settle in.[5]

**D**

To reset the stage briefly: When challenging multiple provisions of a law, a plaintiff must establish standing as to each one. A free-speech plaintiff has suffered an injury in fact—and, in this case, has therefore demonstrated standing—if the challenged law objectively chills protected expression. And for summary

---

[5] At oral argument, the plaintiffs' counsel agreed that, under *CAMP*, we have to conduct a provision-by-provision standing analysis. *See* Tr. of Oral Argument at 16:28. She contended, though, that the district court's categorical approach comported with *CAMP* because the ordinance's provisions overlap with one another. *See id*. at 16:44. True, some provisions do overlap, but it doesn't follow that a court is relieved of its obligation to verify each plaintiff's standing to challenge each provision. And as our analysis will show, the district court's method often led it to find standing where there was none.

judgment to be proper, there mustn't be a genuine issue of material fact as to standing.

With that recap, let's assess the plaintiffs' standing to challenge each of the 18 provisions that they contend violate their First Amendment rights.

**i**

First up is § 66-1(c)(1), which prohibits "aggressive panhandling." Each plaintiff has said that, in the future, he may solicit donations in ways that are criminalized by (c)(1). That includes, for example, requesting a donation from someone when standing within two feet of him, which all plaintiffs have said they might do. The plaintiffs have been arrested, threatened with arrest, or both for violating the ordinance, and Willis has seen others get arrested while panhandling. In light of this enforcement history, a reasonable person would refrain from soliciting in any way defined as "aggressive panhandling" despite an inclination to do so. Paragraph (c)(1) therefore objectively chills the plaintiffs' speech, and they have satisfied their initial burden to show that there is no genuine dispute as to their standing to challenge that provision.

The city responds that, during discovery, the plaintiffs denied having previously panhandled aggressively. But that concession doesn't negate the fact that the plaintiffs may want to engage in "aggressive panhandling" but are deterred from doing so by paragraph (c)(1). We conclude that, based on the available evidence, there is no genuine dispute that the plaintiffs have standing to challenge (c)(1).

**ii**

The plaintiffs also challenge eight separate provisions of § 66-1(c)(3), which prohibit panhandling in certain locations. To establish their standing as to these provisions, the plaintiffs argue that the location-based prohibitions cover areas where they panhandle. To determine whether the plaintiffs have shown the absence of a genuine factual dispute regarding their standing, we consider whether the particular urban features designated in the law are sufficiently prevalent in the areas where they panhandle that there can be no meaningful doubt that the provisions at issue objectively chill their speech.

Subparagraph (c)(3)(a) prohibits panhandling within 20 feet of the entry to or exit from any commercially zoned property. Willis, Driggers, and Rowland have shown that there is no genuine dispute that this provision chills their speech. According to maps in the record,[6] there's a substantial amount of commercial property on the beach side of Daytona Beach and near the Boardwalk—both areas where Willis panhandles. Because of the threat of arrest, Willis has stopped holding a sign and has reduced his panhandling. That self-censorship is objectively reasonable in the face of possible prosecution, and the city has pointed to no record evidence that undermines Willis's standing. The maps also show that there is commercial property on the southern corners of Mason and Ridgewood Avenues, where Driggers and Rowland panhandle. Both

---

[6] The maps identify panhandling exclusion zones based on urban features like business entrances and exits, ATMs, parking areas, etc.

have had to move to the northern side of Ridgewood because of threatened enforcement, which indicates objective chill. And as with Willis, the city hasn't identified any record evidence that undermines Driggers and Rowland's standing. Scott, by contrast, hasn't shown the absence of a material fact as to his standing to attack subparagraph (c)(3)(a). There are shopping centers along International Speedway, but only a few commercial entrances and exits along the road. Because depending on exactly where Scott panhandles, (c)(3)(a) may or may not objectively chill his speech, he hasn't clearly established his standing to challenge the provision.

Subparagraph (c)(3)(b) prohibits panhandling within 20 feet of any bus or trolley stop or any public-transportation facility. All plaintiffs have conclusively shown standing to challenge this provision. As to Willis, the maps show a number of bus stops near the Boardwalk. As to Driggers and Rowland, the maps identify a bus stop very near the southern corner of Mason and Ridgewood. And as to Scott, there are numerous bus stops up and down International Speedway. Because exclusion zones around transit stops cover the areas where each plaintiff panhandles, enforcement of (c)(3)(b) objectively chills their speech.

Subparagraph (c)(3)(c) prohibits panhandling within 20 feet of ATMs and other cash-dispensing machines. No plaintiff has shown that this provision indisputably chills his speech. As to Willis, the maps show some ATMs in the area where he panhandles, but they aren't so pervasive, or so particularized to specific locations where he operates, that the provision would clearly cause a

reasonable person to modify his behavior. Similarly, as to Driggers and Rowland, there appears to be an ATM near the southeastern corner of Mason and Ridgewood, but the presence of that single ATM doesn't definitively show an objective chill. And as to Scott, there don't appear to be any ATMs along the road where he panhandles.

Subparagraph (c)(3)(d) prohibits panhandling within 20 feet of a city-owned parking lot, meter, or pay station. No plaintiff has conclusively established standing to challenge (c)(3)(d). Driggers, Rowland, and Scott haven't alleged that they panhandle, or intend to panhandle, near these facilities, and the maps don't show any near where they operate. Willis has presented some evidence that he panhandles near public parking facilities—there are clusters of parking meters near the Boardwalk—but he hasn't shown that public parking is so pervasive, or so particularized to where he panhandles, that (c)(3)(d) indisputably chills his expression.

Subparagraph (c)(3)(e) prohibits panhandling within 20 feet of any public restroom. No plaintiff has established standing to challenge this provision, because the maps don't show public restrooms near any of the areas where any of them operates.

Subparagraph (c)(3)(f) prohibits panhandling within 100 feet of a daycare or school. No plaintiff has established standing to challenge (c)(3)(f). There are schools near the areas where Willis, Driggers, and Rowland panhandle, but the exclusion zones around the schools don't sweep so broadly as to permit the conclusion that

their speech is objectively chilled. The maps don't show any schools in the area where Scott panhandles.

Subparagraph (c)(3)(g) prohibits panhandling within 150 feet of a signalized intersection on certain types of roads. All plaintiffs clearly have standing to challenge this provision. Driggers, Rowland, and Scott have all stated that they panhandle at intersections subject to (c)(3)(g)'s ban. And Willis has said that he has done so along public roadways, and intersection-based exclusion zones substantially cover the area where he operates.

Finally, subparagraph (c)(3)(h) prohibits panhandling on the Boardwalk. Willis has standing to challenge this provision because he has previously panhandled on the Boardwalk and has been threatened with enforcement of the ordinance. By contrast, Driggers, Rowland, and Scott lack standing because none has claimed to have panhandled on the Boardwalk or that he intends to do so

### iii

Next up are nine ostensibly conduct-based provisions in paragraph (c)(4).[7]

Subparagraph (c)(4)(a) prohibits approaching a vehicle to panhandle, solicit or beg, or to offer to perform a service related to the vehicle, or otherwise to solicit the sale of goods or services, if

---

[7] We say "ostensibly" because we agree with the plaintiffs that some of these look more like location-based provisions. We'll call them conduct-based, however, because that's how the ordinance labels them. The label is immaterial to our analysis.

done so in an aggressive manner.  All the plaintiffs have standing to challenge this provision.  As already explained, they all solicit along public roadways, and have indicated they may engage in so-called aggressive panhandling in the future.

Subparagraph (c)(4)(b) prohibits panhandling, soliciting, and begging at any outdoor dining amphitheater, amphitheater seating area, playground, or outdoor merchandise area that is in use at the time.  No plaintiff has definitively shown standing to challenge (c)(4)(b).  Scott, Driggers, and Rowland haven't claimed that they panhandle or intend to panhandle at the covered locations, and the maps don't show a significant number of such locations in the areas where they operate.  As to Willis, there are some outdoor dining areas on the Boardwalk, but he hasn't stated that he panhandles at them, let alone that he does so while they're in use.

Subparagraph (c)(4)(c) prohibits panhandling, soliciting, and begging at transit stops and taxi stands, as well as in public-transit vehicles.  Although all plaintiffs have established that they panhandle *near* public-transit stops, *see supra* at 19 (addressing the plaintiffs' standing to challenge (c)(3)(b)), they haven't shown beyond dispute that they panhandle *at* those locations.  So the plaintiffs haven't clearly established standing to challenge (c)(4)(c).

Subparagraphs (c)(4)(d) through (h) prohibit panhandling that involves certain behavior.  Subparagraph (c)(4)(d) prohibits panhandling, soliciting, and begging aimed at anyone standing in line at a commercial establishment.  Subparagraph (c)(4)(e) prohibits panhandling, soliciting, and begging that involves touching

someone without his or her consent. Subparagraph (c)(4)(f) prohibits the use of any profane or abusive language in the course of panhandling, soliciting, or begging. In a similar way, subparagraph (c)(4)(g) prohibits the use of any gesture or act intended to instill fear in the person being solicited or to make her feel compelled to donate. And subparagraph (c)(4)(h) prohibits panhandling, soliciting, and begging while under the influence of alcohol or illegal drugs. Because none of the plaintiffs claim that they have engaged in, or may engage in, any of the conduct described in subparagraphs (c)(4)(d) through (h), they haven't shown that these provisions objectively chill their speech.[8]

Lastly, subparagraph (c)(4)(i) prohibits panhandling, soliciting, and begging after dark. Driggers, Rowland, and Willis have standing to challenge this provision because they stated that they sometimes panhandle at night.[9] Scott, by contrast, lacks standing

---

[8] At oral argument, the plaintiffs' counsel acknowledged that there was no record evidence that her clients have used or intend to use profanity when panhandling. *See* Tr. of Oral Argument at 20:25. We similarly find no evidence that suggests the plaintiffs have panhandled or intend to panhandle in the ways restricted by (c)(4)(d), (e), (g), and (h).

[9] The city's lone response is that the plaintiffs first mentioned nighttime panhandling in their amended complaint and that their discovery responses reported only that they "sometimes" panhandle after sunset. But the fact that the plaintiffs didn't allege that they panhandle after dark in their initial complaint doesn't undermine their claim to standing—plaintiffs are free to assert new facts in an amended complaint. Nor does the fact that the plaintiffs only *sometimes* panhandle at night negate their standing. How frequently they engage in nighttime panhandling may bear on the degree of chill that they experience, but not on whether they suffer any chill at all.

to challenge (c)(4)(i), because he hasn't said that he has panhandled at night or that he might do so in the future.

⋆    ⋆    ⋆

To sum up, each plaintiff indisputably has standing to attack some, but not all, of the ordinance's provisions:

- Scott has standing to challenge §§ 66-1(c)(1), (c)(3)(b), (c)(3)(g), and (c)(4)(a). He hasn't established standing to challenge §§ 66-1(c)(3)(a), (c)(3)(c)–(f), (c)(3)(h), or (c)(4)(b)–(i).

- Driggers and Rowland have standing to challenge §§ 66-1(c)(1), (c)(3)(a)–(b), (c)(3)(g), (c)(4)(a), and (c)(4)(i). They haven't established standing to challenge §§ 66-1(c)(3)(c)–(f), (c)(3)(h), or (c)(4)(b)–(h).

- Willis has standing to challenge §§ 66-1(c)(1), (c)(3)(a)–(b), (c)(3)(g)–(h), (c)(4)(a), and (c)(4)(i). He hasn't established standing to challenge §§ 66-1(c)(3)(c)–(f) or (c)(4)(b)–(h).

So, where does that leave us? With respect to the provisions that at least one plaintiff indisputably has standing to challenge, we proceed to the merits. *Cf. Murthy v. Missouri*, 603 U.S. 43, 57 (2024) ("A proper case or controversy exists only when at least one plaintiff establishes that she has standing to sue." (citation modified)). Accordingly, in the next Part, we'll consider whether §§ 66-1(c)(1), (c)(3)(a)–(b), (c)(3)(g)–(h), (c)(4)(a), and (c)(4)(i) violate the First Amendment. Because no plaintiff has indisputably established standing to challenge §§ (c)(3)(c)–(f) or (c)(4)(b)–(h), we do not now

24-12662               Opinion of the Court                25

consider their constitutionality.  With respect to the claims that the plaintiffs haven't indisputably established standing to pursue, we vacate the district court's order granting summary judgment.  On remand, the court should determine for each provision whether (1) each plaintiff lacks standing entirely, in which case his claim should be dismissed, or (2) there is a genuine dispute regarding standing, in which case the issue should be resolved at trial.

### III

On then—at last—to the merits of the First Amendment issue.[10]  Our analysis proceeds in three sequential steps.  First, we must determine whether the plaintiffs' panhandling is protected by the First Amendment.  That much is easy—we have previously held that panhandling is speech within the First Amendment's ambit.  *Smith v. City of Fort Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999).  Second, in order to assign the appropriate standard of scrutiny, we must decide whether the challenged provisions are "content-based" or "content-neutral."  Although less straightforward than the coverage issue, we conclude, for reasons we'll explain, that the provisions are content-based and therefore trigger strict (rather than intermediate) constitutional scrutiny.  Finally, having concluded that strict scrutiny applies, we must conduct the narrow-

---

[10] We review questions of constitutional law de novo.  *Food Not Bombs*, 901 F.3d at 1239.

26                    Opinion of the Court                    24-12662

tailoring inquiry.  We conclude, as is so often the case, that the city has failed to satisfy that exacting standard.[11]

## A

### 1

In free-speech cases, whether a law is content-based or content-neutral is often dispositive.  If a speech restriction is content-based, it's presumptively unconstitutional and subject to strict scrutiny.  *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  By contrast, if the restriction is content-neutral, it faces the loosey-goosier intermediate scrutiny.  *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  Because the doctrinal test for identifying content-based regulations has evolved over the years, we think it'll be useful to begin by briefly sketching that history.

---

[11] One prefatory matter:  The plaintiffs have brought both facial and as-applied challenges.  Under *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), we analyze their facial challenge using a two-step test.  First, we "assess the . . . law['s] scope," asking "[w]hat activities, by what actors, do[es] the law[] prohibit or otherwise regulate?"  *Id.* at 724.  Second, we "decide which of the law['s] applications violate the First Amendment, and . . . measure them against the rest."  *Id.* at 725.  Here, the city's ordinance "prohibit[s] or otherwise regulate[s]" just one "activit[y]," *id.* at 724—"panhandling," *see* Daytona Beach, Fla., Code § 66-1(c), which, for reasons already explained, *see supra* at 4–7, includes "begging," "soliciting," and "aggressive panhandling."  Accordingly, the plaintiffs' facial challenge turns on whether the challenged provisions' "applications" to panhandling "violate the First Amendment"—because, if they do, there are no constitutional applications to balance the scales.  *Moody*, 603 U.S. at 725.

The distinction between content-based and content-neutral speech restrictions took shape—and became a central pillar of First Amendment jurisprudence—in the latter part of the 20th century. *See* Erwin Chemerinsky, *Content Neutrality as a Central Problem of Freedom of Speech*, 74 S. Cal. L. Rev. 49, 51–53 (2000).  From the very outset, the Supreme Court found the line between content-based and content-neutral laws difficult to draw.

In particular, the Court's decisions vacillated between competing understandings of what marked a restriction as content-based.  *See* Genevieve Lakier, Reed v. Town of Gilbert, Arizona, *and the Rise of the Anticlassificatory First Amendment*, 2016 Sup. Ct. Rev. 233, 234.  On the one hand, the Court sometimes focused on the government's apparent purpose, treating even facially content-based restrictions relatively leniently so long as they didn't indicate a censorial motivation.  The point, the Court said in those cases, was "that content discrimination raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992) (citation modified).  In other words, content discrimination was a problem principally because it suggested government malfeasance.  By this logic, a speech restriction that drew lines based on content but didn't otherwise evince bias against particular viewpoints or speakers wasn't content-based in a constitutionally problematic sense. *See Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984).

On the other hand, the Supreme Court sometimes emphasized facial content discrimination, regardless of ostensible government motive. The Court's decision in *Burson v. Freeman*, 504 U.S. 191 (1992), is illustrative. There, without inquiring into purpose or intent, the Court held that an election law was facially content-based, and therefore subject to strict scrutiny, because its application "depend[ed] entirely on whether [someone's] speech is related to a political campaign." *Id.* at 197–98.

In *Reed v. Town of Gilbert*, the Supreme Court sought to clarify the doctrine. Employing what it called a "commonsense" understanding of the phrase "content based," the Court articulated a bright-line rule: A speech restriction is content-based if "on its face" it "draws distinctions based on the message a speaker conveys." 576 U.S. at 163 (citation modified). And importantly, the Court held that such a law "is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Id.* at 165 (citation modified). *Reed* represented the triumph of the facial over the purposive approach to the content-discrimination inquiry.

In the ensuing years, some lower courts read *Reed* quite (and as it turns out, too) expansively. They interpreted the decision to establish a strict "read the sign" rule, under which a law was content-based if it required one to look at speech's substance to determine whether the law's restriction applied. In *Reagan National Advertising of Austin, Inc. v. City of Austin*, 972 F.3d 696 (5th Cir. 2020),

24-12662                Opinion of the Court                29

rev'd, 596 U.S. 61 (2022), for instance, the Fifth Circuit considered a city ordinance that applied different rules to on-premises and off-premises signs advertising products or services. *Id.* at 699–700. The court held that the ordinance was content-based because, it said, "[t]o determine whether a sign is on-premises or off-premises, one must read the sign and ask: does it advertise a business, person, activity, goods, products, or services" located offsite? *Id.* at 704 (citation modified). In other words, the court reasoned, because viewing the sign's content was a prerequisite to determining how the ordinance applied, the law was facially content-based within the meaning of *Reed*. *See id.* at 704–05.[12]

On review, the Supreme Court retained the core of *Reed*'s analytical framework but rejected the Fifth Circuit's absolutist approach. The Court reiterated that a regulation is facially content-based if it "targets speech based on its communicative content." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (citation modified) (quoting *Reed*, 576 U.S. at 163). And importantly, the Court reaffirmed *Reed*'s holding that a regulation whose terms distinguish among topics or subjects is content-based regardless of the government's motivation. *See id.* at 71.

The Court held, though, that the Fifth Circuit's wooden read-the-sign rule was "too extreme an interpretation" of *Reed*. *Id.*

---

[12] The Sixth Circuit applied *Reed* to a similar sign regulation and reached the same conclusion, holding that the law was "plain[ly]" content based. *Thomas v. Bright*, 937 F.3d 721, 730 (6th Cir. 2019), *abrogated by City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61 (2022).

at 69.  A law is "agnostic as to content," the Court clarified, if it "requires an examination of speech only in service of drawing neutral . . . lines" unrelated to expression.  *Id.* at 69.  The ordinance at issue qualified as content-neutral because a particular sign's "substantive message" was irrelevant to the law's application; one had to consider its content only to determine whether the sign was on- or off-premises.  *Id.* at 71.  Because location—a non-speech consideration—determined how the city treated the sign, the ordinance didn't discriminate based on content.  *See id.*

Importantly for present purposes, in support of its clarification the Court pointed to regulations of "solicitation," which it defined as "speech 'requesting or seeking to obtain something' or '[a]n attempt or effort to gain business.'"  *Id.* at 72 (quoting *Solicitation*, Black's Law Dictionary, *supra*).  Needless to say, one has to read or listen to speech to determine whether it "request[s] . . . something" or attempts to "gain business."  *Id.*  But, the Court said, that fact alone doesn't automatically render every solicitation restriction content-based.  Rather, the Court explained, a law that "applie[s] evenhandedly to all who wish[] . . . to solicit" regardless of their purpose, *id.* at 73 (citation modified) (quoting *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981))—put simply, a law that regulates "solicitation generally," *id.* at 72 (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 306–307 (1940))—will be deemed content-neutral.  Accordingly, the government can generally regulate "solicitation" as a category without triggering strict scrutiny, but drawing more granular content-based lines—*i.e.*, singling out particular kinds of solicitation—will do so.

24-12662                Opinion of the Court                31

For its analogy to solicitation regulations, the *Austin* Court drew on *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981). There, organizers of a state fair restricted solicitations to fixed locations to ensure the orderliness of the event, which attracted more than 100,000 daily visitors. *See id.* at 643–44, 650. Members of the Krishna faith challenged the rule, arguing that it unconstitutionally limited their ability to distribute literature and solicit donations. *Id.* at 645. The Court rejected the Krishnas' contention. The rule, the Court said, was not "based upon either the content or subject matter of speech" because it "applie[d] evenhandedly to all who wish to distribute and sell written materials or to solicit funds." *Id.* at 648–49. "No person or organization," the Court emphasized, "whether commercial or charitable, is permitted to engage in such activities except from a booth rented for those purposes." *Id.* at 649.

So again—and importantly for us—under *Heffron* and *Austin*, a rule that restricts "solicitation" may be content-neutral—but only if it regulates categorically and "evenhandedly." *Austin*, 596 U.S. at 72–73 (quoting *Heffron*, 452 U.S. at 649). A rule that discriminates among subcategories of solicitation—say, by applying different rules to requests for commercial and charitable donations—loses its claim to content-neutrality. And with narrow exceptions, the rule's content-based-ness renders it constitutionally suspect.[13]

―――――――――――――

[13] The exception most relevant to solicitation regulations is the commercial-speech doctrine, which allows "the State [to] regulate some types of commercial advertising more freely than other forms of protected speech." *44*

★    ★    ★

Taking stock:  It seems to us that, from *Reed* and *Austin*, three principles emerge that inform our analysis of the free-speech issues in this case:  First, there's the fairly obvious fact that the government-motive test is dead; a rule that on its face "targets speech based on its communicative content" is content-based, however benign the government's intent.  *Id.* at 69 (citation modified) (quoting *Reed*, 576 U.S. at 163).  Second, there's the general rule that the mere fact that someone has to look at the content of speech to decide whether a rule applies doesn't render the rule content-based. Third, there's the more particular rule governing solicitations:  A general regulation that applies "evenhandedly" to all forms of solicitation is considered content-neutral, whereas a solicitation regulation that further "discriminate[s] based on topic, subject matter, or viewpoint"—*i.e.*, one that singles out particular types of solicitations—is content-based and presumptively unconstitutional.  *See id.* at 72–73.

**2**

**a**

The challenged provisions of Daytona Beach's anti-panhandling ordinance are content-based because they target only one particular type of solicitation—namely, "demand[s] or request[s] made in person for an immediate donation of money or some other

---

*Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 498 (1996) (opinion of Stevens, J.).  The issues in this case don't implicate the commercial-speech doctrine.

24-12662              Opinion of the Court                    33

article of value." Daytona Beach, Fla., Code § 66-1(b)(3).[14] Two features of the ordinance, we think, make plain its content discrimination.

---

[14] One important preliminary matter: Our decision in *Smith v. City of Fort Lauderdale* doesn't compel the conclusion that Daytona Beach's ordinance is content-neutral. *Smith* involved a Fort Lauderdale rule that prohibited panhandling along the city's beaches. 177 F.3d at 955. After observing that the plaintiffs there didn't dispute that the rule was content-neutral, the panel in *Smith* applied intermediate scrutiny and upheld it. *Id*. at 956–57.

Under our precedent about precedent, a prior panel's holding binds subsequent panels "unless and until the first panel's holding is overruled by the Court sitting en banc or by the Supreme Court." *United States v. Bazantes*, 978 F.3d 1227, 1243–44 (11th Cir. 2020). There is, though, an important caveat: "[T]he prior precedent rule applies only to the actual holdings of prior decisions on issues that were *actually decided* by the earlier panel." *Id*. at 1244 (emphasis added).

*Smith* didn't "actually decide[]" the content-neutrality question within the meaning of the prior-panel-precedent rule. The panel's entire discussion of the issue consisted of a single sentence noting that the plaintiffs there had conceded the ordinance's content-neutrality. *Smith*, 177 F.3d at 956. The panel provided no independent analysis; instead, it simply accepted the parties' stipulation and then focused its attention on whether the rule survived intermediate scrutiny. Because *Smith* doesn't constitute an "actual[] deci[sion]" of the content-neutrality issue, it doesn't control our determination here.

This conclusion comports with longstanding Supreme Court precedent. The Court has clarified that "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)). Because the parties in *Smith* didn't contest whether the rule there was content-based or content-neutral, they didn't "br[ing]" the question "to [our] attention" in any meaningful sense. Nor, for reasons

First, and perhaps most obviously, the city candidly concedes that "the law does not regulate commercial solicitations." Br. of Appellant at 26. That fact alone takes the ordinance outside *Heffron*'s protection and betrays its content-based-ness. Recall that the Supreme Court in *Heffron* deemed content-neutral rules that neutrally prohibit *all* solicitations, regardless of the speaker's "commercial or charitable" purpose. 452 U.S. at 649. By restricting pleas for immediate donations *but not* commercial entreaties, Daytona Beach's ordinance discriminates based on content. *Cf. Café Erotica of Fla., Inc. v. St. Johns Cnty.*, 360 F.3d 1274, 1289 (11th Cir. 2004) (holding that an ordinance that "allow[ed] commercial messages to be displayed more prominently than political messages" was content-based).[15]

Second, and even aside from the commercial-charitable distinction generally, there is the ordinance's actual, everyday operation. Again, given its definition of "panhandling," whether the law restricts a speaker's expression turns entirely on whether he makes a request for an immediate donation. So, for example, an

---

already explained, did we "rule upon" that question on the merits. Rather, under *Cooper* and its predecessors, the content-neutrality issue was a nonprecedential "lurk[er]."

[15] Perhaps realizing that regulating requests for donations but not commercial solicitations poses a content-neutrality problem, the city argues that it has a good reason not to include commercial solicitations within the ordinance: The city already regulates them in other parts of its municipal code. The city, however, cites no authority for the idea that a content-based law should be considered content-neutral simply because the type of speech not covered by the law is regulated elsewhere.

24-12662              Opinion of the Court                35

individual standing at an intersection with a sign reading "Hungry—Please Help Me" would violate the ordinance. But an individual standing in the same place with a sign imploring passersby to "Help Your Local Humane Society" wouldn't. So too, an individual on the Boardwalk asking beachgoers to "spare some change" would break the law, but a Greenpeace volunteer urging pedestrians to sign a "Save The Whales" petition wouldn't. It is content, therefore, that triggers the ordinance's application. The ordinance thus fails the "evenhanded[ness]" principle articulated in *Heffron* and reaffirmed in *Austin*. Unlike in *Heffron*, *some* "person[s] or organizations[s]"—the Humane Society supporter, the Greenpeace volunteer, etc.—"[are] permitted to engage in" solicitation. 452 U.S. at 649. Only one category of would-be solicitors is prohibited from speaking up to ask for support: those seeking immediate donations.

**b**

The city isn't without responses, of course. We'll consider the city's contentions in turn.

**i**

Most forcefully, the city argues that *immediacy*, like the location criterion in *Austin*, is an external, non-speech referent that renders its ordinance content-neutral. *See Austin*, 596 U.S. at 69. So, the city's argument goes, the ordinance is "agnostic as to content"—one needs to look at the content of the speech in question, it says, only to determine whether it constitutes a request for an immediate donation. Br. of Appellant at 25. We aren't convinced.

A location criterion of the sort at issue in *Austin* has no meaningful effect on the speaker's message.  Consider two signs for a barbeque restaurant.  The on-premises sign reads, "Come inside for the world's best ribs!"  The off-premises sign, "Head to Archibald's for the world's best ribs!"  The communicative content is essentially the same:  Archibald's has the best ribs, and folks should patronize the restaurant to try them.

The ordinance's immediacy criterion, by contrast—at least as it pertains here—*does* relate to the speaker's message.  Indeed, whether an individual asks for a donation now or at some later time goes to the heart of that message.  There is a meaningful substantive difference between a sign that reads "Hungry—Please Help Me" and one that says "Hungry—Please Help Me by Donating to the Food Bank."  The first sign communicates a message of urgent personal need, whereas the second conveys a message of more general distress.  The first evokes acute hunger pangs; the second more vaguely references chronic food insecurity.  To be sure, the two signs are similar—both indicate that the speaker is hungry, and both seek support.  But the immediacy of the first sign's request inflects the speech with a sense of exigency that the second sign lacks.  And that sense of exigency is critical to the sign's communicative content. And yet Daytona Beach's ordinance prohibits it.

We think the city tips its hand when it emphasizes that a "if [a] speaker requests a donation of money at some future time or place, she can do so without any restrictions at all."  Br. of Appellant at 28.  That's precisely the problem.  If an individual addresses

one topic—future donations—he can speak freely.  But if the same person wants to address a different topic—immediate help—his options are severely limited.  That disparate treatment, it seems to us, is textbook content discrimination.

**ii**

The city makes two additional arguments why its ordinance is content-neutral, but neither persuades us.  First, the city insists that the ordinance is content-neutral because it restricts "all requests for the immediate donation of money . . . regardless of content, viewpoint or the identity of the speaker."  Br. of Appellant at 25.  Put another way, the ordinance "clearly defines solicitations so that it reaches *every* conceivable instance where an immediate donation is made in response to a request."  *Id.* at 24–25.

The city, it seems to us, might be saying either of two things, neither of which solves its content-discrimination problem.  As an initial matter, the city might be contending that the ordinance's content-neutrality is preserved simply because it doesn't draw even more fine-grained content-based distinctions than it already does—say, between requests for charitable donations and requests for political donations.  If so, it's wrong.  For reasons already explained, by targeting requests for immediate donations, the ordinance *already* discriminates on the basis of content.  The mere fact that it doesn't go *even further* is no salve.  The absence of speaker-based, viewpoint-based, or more granular content-based lines, doesn't cure the existing content discrimination.

Alternatively, the city might be contending that the ordinance finds safe harbor in *Austin*'s "solicitation" carveout. Again, we disagree. Recall that in *Austin*, the Supreme Court—adverting to its earlier decision in *Heffron*—defined solicitation broadly as any "speech 'requesting or seeking to obtain something' or 'an attempt or effort to gain business.'" 596 U.S. at 72 (citation modified) (quoting *Solicitation*, Black's Law Dictionary, *supra*). If the ordinance here truly restricted *all* solicitations, as that term is commonly understood, then the city's reliance on *Austin* might be well-founded. But it doesn't, and so it's not. As we've explained, the ordinance effectively redefines (or term-of-art-ifies) the word "solicitation" as a constituent of the term "panhandling." *See* Daytona Beach, Fla., Code § 66-1(b)(3) ("Soliciting is includ[ed] in this definition of panhandling."). So as used in the ordinance, a "solicitation" covers *only* a request for an immediate donation. Accordingly, the ordinance singles out a particular topic for differential treatment. And that, for reasons already covered, makes it facially content-based.

Second, and separately, the city points to a handful of out-of-circuit decisions, which it says suggest that laws targeting requests for immediate donations aren't content-based. Only one warrants above-the-line treatment,[16] and even it is readily

---

[16] In *Waggoner v. City of Dallas*, No. 3:22-CV-2776-E-BK, 2023 WL 5516474 (N.D. Tex. July 20, 2023), *report and recommendation adopted*, No. 3:22-CV-02776-E-BK, 2023 WL 5517220 (N.D. Tex. Aug. 25, 2023), the court held that a city ordinance was facially content-neutral because it "prohibit[ed] all persons"—with a few narrow, non-speech-related exceptions—"from standing or walking on designated medians and clear zones." *Id*. at *6. And in *United*

24-12662                Opinion of the Court                          39

distinguishable.  In *National Federation of the Blind of Texas, Inc. v. City of Arlington*, 109 F.4th 728 (5th Cir. 2024), the Fifth Circuit held that an ordinance restricting the placement of donation boxes (think clothes, toys, etc.) didn't discriminate based on content because the law "regulate[d] all donation boxes without reference to content."  *Id.* at 734.  The court emphasized that the restriction

---

*States v. Lee*, No. 1:23-CR-00368, 2024 WL 4836401 (D.D.C. Nov. 20, 2024), *vacated,* No. 24-3171, 2025 WL 415328 (D.C. Cir. Feb. 3, 2025), the court held that the closure of much of the Capitol Grounds on January 6, 2021, was content-neutral because the area "was walled off to all members of the public *writ large.*"  *Id.* at *5.  So, unlike Daytona Beach's ordinance, the regulations in *Waggoner* and *Lee* didn't even refer to speech, let alone single out speech about a specific topic.

In *Mazo v. New Jersey Secretary of State*, 54 F.4th 124 (3d Cir. 2022), the court addressed a law requiring political candidates to obtain consent before naming a person or organization in a ballot slogan.  *Id.* at 133.  The court viewed the case as a straightforward application of *Austin*, because one had to look at the content of the slogan only to determine whether the consent requirement applied—whether a third party had consented to the use of its name had nothing to do with the slogan's communicative content.  *Id.* at 149.  Not so here, where a request for an immediate donation *is* the communicative content.

Lastly, in *Project Veritas v. Schmidt*, 125 F.4th 929 (9th Cir. 2025), the court held that an Oregon law prohibiting unannounced audio recording of conversations was content-neutral, even though it had carveouts for recordings of felonies and law-enforcement interactions.  *See id.* at 950–51.  Those exceptions, the court held, turned on *when* or *with whom* a conversation occurred, not on *what* the conversation was about.  *See id.* at 951–52.  That's not the case here.  Daytona Beach's panhandling ordinance applies only when someone requests an immediate donation—in other words, its application turns on *what* one's speech is about.

didn't single out requests for "charitable" donations—by which it meant donations to those genuinely in need—but, rather, applied to all donation boxes, regardless of purpose. *Id.* at 735. So, the court concluded, because the ordinance "encompass[ed] both charitable and non-charitable solicitations," *id.*, it was "agnostic as to content," *id.* (quoting *Austin*, 596 U.S. at 69).[17]

Whatever the merits of the Fifth Circuit's decision, it's enough to point out that the ordinance here is different from the one the court confronted there. In particular, Daytona Beach's ordinance goes an important (and content-based) step farther. It doesn't generically target donations in the way the ordinance at issue in *National Federation* did; rather, it targets only requests for *immediate* donations, treating them differently from future donations. So whereas "[t]he signage on the donation boxes [was] of no consequence" in *National Federation*, *id.* at 734, the substance of a request for a donation—its "signage," if you will—is dispositive under Daytona Beach's ordinance. And for reasons already explained, the immediate-donation-versus-future-donation distinction impermissibly discriminates on the basis of content.

⋆      ⋆      ⋆

---

[17] The city also briefly adverts to *U'SAgain, LLC v. City of Los Angeles*, No. CV 24-6210-CBM-BFMx, 2024 WL 4127273 (C.D. Cal. Sept. 9, 2024), which upheld a similar donation-bin restriction. Because the court there employed logic similar to the Fifth Circuit's and cited *National Federation* in concluding that Los Angeles's regulation was content-neutral, *see id.* at *3, our discussion of *National Federation* also addresses the city's reliance on *U'SAgain*, as well.

Taking stock, once again:  Even if with the best of intentions, Daytona Beach has singled out a category of speech—requests for immediate donations—for disfavored treatment based on its communicative content.  Under *Reed* and *Austin*, that renders the ordinance facially content-based.  And unlike the location criterion in *Austin*, there is no non-speech referent that renders the ordinance content-neutral; immediacy can't be disentangled from the donation request's message—it is part and parcel of it.  Finally, because the ordinance targets only a specific subset of solicitations—namely, requests for immediate donations of the sort that constitute "panhandling"—*Austin*'s solicitation carveout doesn't rectify the ordinance's content-discrimination.

**B**

Because the challenged provisions of Daytona Beach's ordinance are facially content-based, they are presumptively unconstitutional and subject to strict scrutiny.  *Reed*, 576 U.S. at 163.  We hold that they fail that test.

Strict scrutiny is an exacting standard, one that few speech restrictions survive.  *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015).  To satisfy strict scrutiny, the city must demonstrate (1) that it is pursuing a compelling government interest (2) by the least speech-restrictive means available to it.  *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000).  The city proffers two interests, which we'll examine in turn.

**1**

The city first asserts that the ordinance is necessary to protect the public health. Panhandling, the city claims, is linked to public urination and defecation, which, in turn, can spread diseases that cause serious illness and even death. Before the district court, several witnesses—law-enforcement officers, fire-department personnel, public workers, and local merchants—testified to the connection between panhandling and public urination and defecation, and the city's expert confirmed that exposure to public urination and defecation can cause sickness. The plaintiffs dispute that panhandling spreads pathogens, but given the procedural posture, we must take the facts in the light most favorable to the city and draw all reasonable inferences in its favor. Accordingly, we think it's appropriate to infer a connection between panhandling, public urination and defecation, and the spread of disease. And we agree with the city that protecting the public from the spread of infectious diseases is a compelling government interest. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020).

The problem is that the city could advance that interest by less speech-restrictive means. Most obviously, it could simply enforce the laws already on its books. As the plaintiffs point out, Daytona Beach's disorderly-conduct ordinance criminalizes "defoul[ing] or disturb[ing] public property or private property of another so as to create an unsafe, unhealthy or unsanitary condition." Daytona Beach, Fla., Code § 62-37(a)(7). The city protests that existing laws can't fully address the disease risk that panhandling poses. For support, it cites the deposition of the deputy city

manager, who testified that the city hadn't attempted to prosecute people for public defecation, in part because it couldn't muster the resources to "prosecute a crime that the system regards as minor or insignificant." But the city can't claim that less speech-restrictive means are inadequate when it hasn't even tried to employ them or dedicated enough money or manpower to make them effective. *Cf. Playboy*, 529 U.S. at 816, 823 (concluding that the government hadn't shown that the low take-up rate of an opt-in adult-content blocking feature rendered it ineffective because the government failed to promote the technology to consumers). Because the city hasn't seriously attempted to use existing, on-point laws to mitigate the spread of disease connected to public urination and defecation, it may not address the problem indirectly by prohibiting speech that's only arguably associated with those issues.

**2**

The city separately contends that the ordinance promotes traffic safety. Panhandlers approaching cars at busy intersections, the city says, expose both themselves and drivers to serious risk. For support, the city cites several instances in which panhandlers were hit by cars, as well as one in which a panhandler distracted a driver, who crashed into two other vehicles. So, according to the city, the ordinance is an appropriate way to ameliorate risks to both pedestrians and drivers.

Even on the assumption the city's particular traffic-related interests are compelling, *but cf. Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1268 (11th Cir. 2005) (rejecting a blanket rule that

44                    Opinion of the Court                    24-12662

"traffic safety" is a compelling government interest), the challenged provisions fail strict scrutiny's narrow-tailoring requirement. That is so for two reasons. First, as with its interest in public health, the city may well be able to address the traffic-safety issues it identifies by enforcing its existing laws against disorderly conduct, trespass, and obstruction of traffic. *Cf. Vigue v. Shoar*, 494 F. Supp. 3d 1204, 1229 (M.D. Fla. 2020) (holding that a state's "legitimate interest in road safety 'can be better served by measures less intrusive than a direct prohibition on solicitation'" (quoting *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637 (1980))), *voluntarily dismissed*, No. 20-14285-V (11th Cir. Sep. 1, 2021). But yet again, the city hasn't tried those options or explained why they wouldn't work.

Second, the ordinance is fatally underinclusive. Underinclusiveness "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011).[18] In *Brown*, for example, the Supreme Court invalidated a California law that restricted the sale of violent video games to minors, in part on the ground that it didn't limit access to other media that comparably increased children's feelings of aggression. *Id.* at 801–02. Here, the city asserts that people who

---

[18] The city insists that underinclusivity is solely a tool for determining whether or not a law is content-based, and that it's irrelevant to the narrow-tailoring inquiry. That is incorrect. It's well established that, while not dispositive, underinclusivity is relevant to whether a law advances a compelling interest. *Williams-Yulee*, 575 U.S. at 448–49.

24-12662                Opinion of the Court                45

repeatedly approach cars at busy intersections face a substantial risk of serious injury.  But even if that's true, the ordinance regulates only those individuals who approach cars at busy intersections *to communicate a particular message*.  So, as in *Brown*, the ordinance inexplicably targets only one speech-related problem—the risk posed by individuals requesting immediate donations—while leaving unburdened similar threats to pedestrian safety—for example, the risk posed by those soliciting signatures for petitions.[19]

⋆    ⋆    ⋆

In sum, the city has failed to demonstrate that its ordinance is the least speech-restrictive means to prevent the spread of disease and to reduce the risk of injury-causing traffic accidents.  The challenged provisions at issue therefore fail strict scrutiny and violate the First Amendment.

## IV

Having held that a number of the challenged provisions violate the First Amendment, we turn to the question of remedy.  In

---

[19] The city responds that the record shows that people soliciting immediate donations are at a higher risk of being struck by cars than other solicitors.  But for support, the city musters only scattered anecdotes that show, at most, that panhandlers face *some* risk—not that they face a *higher* risk.  *See, e.g.*, Br. of Appellant at 40 (citing a police officer's deposition describing one incident in which a panhandler was killed in a traffic accident); Reply Br. of Appellant at 19 (citing a police officer's affidavit referencing two instances in which panhandlers were hit by cars).

its summary judgment order, the district court declared all 18 challenged provisions unconstitutional and permanently enjoined the city from enforcing them—against anyone.  Subsequently, in its order entering final judgment, the court awarded the plaintiffs $80,000 in damages, consistent with the parties' stipulation.  For the sake of clarity, we'll address the district court's declaratory judgment, injunction, and damages award in turn.

## A

The district court's declaratory judgment was too broad:  It held unconstitutional provisions of the ordinance that no plaintiff had clearly established standing to challenge—namely, §§ (c)(3)(c)–(f) and (c)(4)(b)–(h).  Because genuine issues of fact regarding standing preclude summary judgment in the plaintiffs' favor, the district court should have refrained from granting the plaintiffs declaratory relief until their standing was properly adjudicated at trial.  Accordingly, we vacate the court's declaration that these provisions are unconstitutional.  Because at least one plaintiff established standing to challenge the remaining provisions, and because we agree with the district court's merits analysis, we affirm its declaration that §§ (c)(1), (c)(3)(a)–(b), (c)(3)(g)–(h), (c)(4)(a), and (c)(4)(i) violate the First Amendment.

## B

The district court's injunction was likewise overbroad, for two related reasons.  First, in light of the Supreme Court's intervening decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), the injunction impermissibly operates "universally."  In *CASA*, the Court

held that universal injunctions—in which district courts "prohibit enforcement of a law or policy against *anyone*"—likely exceed federal courts' congressionally granted equitable powers. *Id.* at 837.[20] But that's precisely the form and scope of relief the district court granted here; nothing in its order limited the injunction's operation to the parties. Accordingly, in compliance with *CASA*, we vacate the injunction insofar as it prevents enforcement of the challenged provisions against nonparties.

Second, and relatedly, the injunction is overbroad because it applies to provisions that the plaintiffs haven't clearly established standing to challenge. Equitable remedies are party-specific. *CASA*, 606 U.S. at 844. It follows that if a particular plaintiff hasn't shown standing to challenge a particular provision, a court can't enjoin its enforcement against him. Importantly, this is true even if another plaintiff has standing to attack the provision generally. So while (as we've explained) the question when assessing the merits is whether *any* plaintiff is *a* proper party, *see supra* at 24, the question for equitable-relief purposes is whether a *specific* plaintiff is *the* proper party. *Cf. id.* ("It is an elementary principle that a court cannot adjudicate directly upon a person's right without having him either actually or constructively before it." (quoting *Gregory v. Stetson*, 133 U.S. 579, 586 (1890))); *cf. also* William Baude & Samuel L.

---

[20] *CASA* addressed a universal injunction against the federal government, but the decision's logic applies with equal force to any blanket, non-party-specific injunction. *See Nussbaumer v. Sec'y, Fla. Dep't of Child. & Fams.*, 150 F.4th 1371, 1381 n.5 (11th Cir. 2025) (applying *CASA*'s prohibition on universal relief to a suit against a state agency).

Bray, *Proper Parties, Proper Relief*, 137 Harv. L. Rev. 153, 171 (2023) ("[I]f one party has standing, the Court will need to resolve that party's rights. But figuring out whether all, most, or merely one of the parties has standing will be exceptionally important for determining what relief a court should ultimately issue.").

Here, the district court should have enjoined enforcement of a particular provision against a plaintiff only if *that* plaintiff had standing to challenge *that* provision. Accordingly, we affirm the portion of the district court's order enjoining the city from enforcing §§ 66-1(c)(1), (c)(3)(b), (c)(3)(g), and (c)(4)(a) against Scott; §§ 66-1(c)(1), (c)(3)(a)–(b), (c)(3)(g), (c)(4)(a), and (c)(4)(i) against Driggers and Rowland; and §§ 66-1(c)(1), (c)(3)(a)–(b), (c)(3)(g)–(h), (c)(4)(a), and (c)(4)(i) against Willis. We vacate the injunction insofar as it barred enforcement of other provisions against the plaintiffs.

## C

Lastly, we consider the district court's $80,000 damages award. As already explained, in their joint motion for the entry of judgment, the parties agreed that if any provision of the ordinance was deemed unconstitutional on appeal, the plaintiffs would be entitled to the full damages amount. We have held that seven of the ordinance's provisions—§§ (c)(1), (c)(3)(a)–(b), (c)(3)(g)–(h), (c)(4)(a), and (c)(4)(i)—violate the First Amendment. Accordingly, we affirm the damages award.

★    ★    ★

To summarize: We **AFFIRM** in part and **VACATE** in part the district court's summary judgment order.  We **AFFIRM** the court's declaration that that §§ (c)(1), (c)(3)(a)–(b), (c)(3)(g)–(h), (c)(4)(a), and (c)(4)(i) violate the First Amendment, but **VACATE** its declaration that §§ (c)(3)(c)–(f) and (c)(4)(b)–(h) do so.  We **AFFIRM** the portion of the district court's order enjoining the city from enforcing §§ 66-1(c)(1), (c)(3)(b), (c)(3)(g), and (c)(4)(a) against Scott;  §§ 66-1(c)(1), (c)(3)(a)–(b), (c)(3)(g), (c)(4)(a), and (c)(4)(i) against Driggers and Rowland;  and  §§ 66-1(c)(1), (c)(3)(a)–(b), (c)(3)(g)–(h), (c)(4)(a), and (c)(4)(i) against Willis, but **VACATE** the injunction in all other respects.  And we **AFFIRM** the $80,000 damages award.

AFFIRMED in part, **VACATED** in part, and **REMANDED**.